**QUICK et al. v. PEVEHOUSE.**

No. 3643.

Court of Civil Appeals of Texas. Amarillo.
July 1, 1931.

Rehearing Denied Sept. 9, 1931.

Duglas & Spiller and Benjamin Kucera, all of Lubbock, for appellants.

Wm. H. Evans, of Lubbock, for appellee.

HALL, C. J.:

Pevehouse brought this suit against Quick and W. K. Dickinson, Sr., to recover an amount alleged to be due him for certain feedstuff which he sold to the defendants.

It is alleged that at the time of the sale the appellant Quick gave plaintiff his individual check for $268.79, and that said check, upon presentation, was dishonored. He alleges that at the time of the sale the defendants Quick and Dickinson were doing business under the name of Yellow House Mills. That such name was used by the Lubbock Grain & Coal Company, a corporation, without authority under their charter to use such name. That plaintiff did not deal with the Lubbock Grain & Coal Company, which he knew to be in failing condition, but dealt with defendants as a firm styled Yellow House Mills. That the defendant Quick represented to plaintiff at the time of the sale that he (plaintiff) was not dealing with the Lubbock Grain & Coal Company, but with a new firm, Yellow House Mills, and that such sale was made relying upon such representations. Plaintiff sues to recover from Quick upon the check and alleges that Dickinson is liable for the amount of the feedstuff. He charges that both defendants are liable for the false and fraudulent representations made by Quick and relied upon by plaintiff and which representations were made with the knowledge and consent of Dickinson. It is further alleged that the Lubbock Grain & Coal Company transacted business under the name of Yellow House Mills contrary to law and the provisions of its charter, and that both defendants knew of such operation under such name, and that plaintiff dealt with them under the name of Yellow House Mills and not with the corporation, the Lubbock Grain & Coal Company, of which corporation the defendants were officers and directors. That they had been such officers and directors for a number of years, purchasing feed during all of such time; that shortly prior to the date of this sale the corporation was unable to meet its current bills, if not, in fact, insolvent; and that during that time the defendants Quick and Dickinson commenced to operate under the name of Yellow House Mills at the place of business of the Lubbock Grain & Coal Company. That said corporation had not lawfully changed its name to Yellow House Mills. He further alleges that at the time of the sale Quick represented that the resources of W. H. Dickinson, Sr., were behind the operation of the Yellow House Mills, and that such representations were made with the intent to induce and did induce the

plaintiff to sell the feed and wait a few days for his check in payment therefor. That Dickinson knew that Quick was representing to the public that he (Dickinson) was behind and stood good for the debts of the Yellow House Mills, and Quick further represented to plaintiff that Dickinson was financially backing the Yellow House Mills and the purchase of grain by Quick. Plaintiff prays for a judgment against both defendants and each of them for the purchase price of the feed.

The defendants filed separate answers, which consist of general demurrers and various special exceptions, and at the conclusion of the introduction of testimony, each defendant moved for an instructed verdict in his favor.

The court, however, submitted the case to the jury upon two special issues, in response to which the jury found as follows:

"1. We find from a preponderance of the evidence that the Lubbock Grain & Coal Co. was doing business in the name of Yellow House Mills at the time of the sale of the feed in question by plaintiff Pevehouse.

"2. We find that the plaintiff Pevehouse did not know at the time of the sale of the feed in question that he was dealing with the Lubbock Grain & Coal Co."

Based upon the verdict, the court rendered judgment against both defendants, who have filed separate supersedeas bonds.

In behalf of Dickinson it is contended that the testimony in this case shows that the obligation sued upon was that of a corporation in which Dickinson was an officer, stockholder, and director, and that there is no competent evidence to show that the name of the corporation had been changed without authority of law so as to make Dickinson personally liable, and even though it had been changed without legal authority, the evidence does not show personal liability upon the part of Dickinson because of such change, and the court should have directed a verdict for Dickinson. It is further urged that the statement made by Quick to the plaintiff that the Lubbock Grain & Coal Company had gone out of business, and that the Yellow House Mills was a new company composed of Dickinson and others, and that Dickinson had the controlling interest in the Yellow House Mills, was hearsay and not binding upon Dickinson, since it was not shown that Quick was his agent or authorized to make the statement.

The testimony is sufficient to sustain the finding of the jury upon both of the issues submitted by the court.

■ As stated above, the suit as against Quick is based in part upon the individual check which Quick gave to Pevehouse. It is not denied that this check represented the purchase price of the feedstuff which Peve-house sold to Quick and that the debt had never been paid. The check is evidence of a bona fide indebtedness and is sufficient to support a judgment against Quick, who signed it individually.

The testimony of Pevehouse with reference to the representations made by Quick to the effect that a new business, operated as the Yellow House Mills, was the purchaser of the feedstuff and that he did not sell to the Lubbock Grain & Coal Company, seems to have been accepted by the jury. He testified that he knew the Lubbock Grain & Coal Company was not solvent. The record shows that he was correct in his surmise. He further stated that in making the sale he relied upon Quick's statement that it was sold to a new business, operated under the name of Yellow House Mills. The testimony of Dickinson is to the effect that there was a new business being operated under that name. Obtaining the feedstuff under these representations and the execution of the check is, in effect, such a fraud as to render Quick personally liable, without regard to whether the corporate name had been changed, and the judgment as to him must be affirmed.

■ The evidence is uncontradicted to the effect that the original corporation had never been dissolved and further shows that Dickinson and his son Byron, together with Quick, owned all of its original stock. In 1928 they sold $20,000 of the $30,000 capital stock of the original corporation to West and his associates, reserving a lien upon the property to secure the debt. West then became general manager of the business and operated it as such for six or seven months, when the directors, becoming dissatisfied with the manner in which he was conducting it, elected Quick as general manager, and according to Dickinson's testimony, West became a traveling salesman and was supposed to be selling the products of the mill. Dickinson says he remained president of the corporation until it became bankrupt, and according to his testimony the Yellow House Mills was a new and separate business, operated by the stockholders of the original corporation, the Lubbock Grain & Coal Company. He testified: "The business was carried on at the same place down there after Mr. West took over the management. Mr. West took a new name for the products of the mill after he took it over. After he taken it over some ninety days, we built a feed mill for the purpose of grinding and mixing feed for the country here and the question came up at that time as to the name of it and it was discussed and we named it Yellow House Mills and that name was put on the sacks. *The new company opened a new bank account* at the Citizens National Bank and opened it under the name of Lubbock Grain & Coal Co. That account was *afterwards* transferred to the First National Bank and the checking account over there

was carried in the Yellow House Mills and *was carried in that name* because we did not want to get the *old business confused with the new*, there were so many checks. The *old business* I refer to was the business Byron, Mr. Quick and myself *were closing out.* \* \* \* In June, 1928, when this transfer and manipulation of stock was made, I continued to be president. I remained president. They elected me president when the change was made and I remained president up until the time of the bankruptcy. Mr. Quick was keeping the money of the corporation in the First National Bank. He was put in charge of the affairs of the business (after West ceased to be manager) and as far as I knew he had the right to place the money in whatever name he saw fit in the bank. As far as I was concerned, he had charge of it and handled it as he pleased. As far as I was personally concerned, it was all right for him to put it in his own bank account. I had no objection and I never knew of the board having any. I can speak for the board one way, I was present at very nearly all of them and I heard of no objections as to how he handled it. *We knew he was handling the account in the name of the Yellow House Mills.*"

J. D. Shaw, who kept the accounts of the Avalanche-Journal, testified that he had an account for advertising in the name of Yellow House Mills during 1929 and that the account was paid by checks signed Yellow House Mills.

It is clear from this testimony that there was a new business carried on separate and apart from the original corporation, even though the latter had not been dissolved. Dickinson calls it "the new company," and says it opened "a new bank account," which was afterwards transferred to another bank where the checking account of the new business was carried on in the name of the Yellow House Mills. He says that the purpose of having separate bank accounts was to avoid confusing the old business with the new. He explains that the old business was the original corporation owned by him, his son, and Quick, which they were "closing out." It further appears from the testimony of both Quick and Dickinson, Sr., that Quick deposited the funds of the new company to the credit of his individual banking account. If it was not a new company, then why were the funds not deposited in the name of the Lubbock Grain & Coal Company? The only reasonable inference from this unusual proceeding is that they realized that the old company was insolvent and that bankruptcy was impending and they were endeavoring to separate the new business from the old, so that they could close out the old business, if possible, or to save the new business and its funds from the wreckage incident to the bankruptcy of the old. He says that they knew Quick was handling the account in the name of the Yellow House Mills.

The appellants insist that based upon these facts, under the case of Robinson v. First National Bank of Marietta, 98 Tex. 184, 82 S.W. 505, 507, there was no partnership, and therefore Dickinson could not be bound by Quick's statements and conduct.

In order to recover against Dickinson, plaintiff alleged that a partnership existed between Dickinson, Quick, and other parties, and in our opinion the legal effect of the jury's finding in response to the first issue is that the Yellow House Mills was a partnership operated by the defendants.

We think the Robinson Case is authority in support of the judgment against Dickinson. It appears that Robinson, Hoskins, Pierce, and Saxon were conducting a mercantile business in Cooke county under the corporate name of Saxon Mercantile Company. That the company had financial troubles and the business was transferred to Marietta, Okl., where Saxon and Pierce continued the business under the name of Saxon, Pierce & Co., but which it appears was not duly incorporated. Saxon, Pierce & Co. negotiated the loan from the appellee bank and represented that Robinson and Hoskins were interested in the business, and in a suit upon the note wherein the bank sought to hold Robinson and Hoskins, judgment was rendered against all of the defendants. The case reached the Supreme Court, where the judgments of both the trial court and the Court of Civil Appeals (79 S. W. 103) were reversed, as to Robinson and Hoskins. It appeared that Saxon and Pierce had been discharged in bankruptcy before the judgment was rendered. Counsel for the defendants requested the court to instruct the jury as follows: "If you find it was understood between the plaintiff's cashier and J. A. Saxon and B. F. Pierce at the time the loan was made for which the note herein sued on was given, that said note was being made to a corporation and that the name of Saxon, Pierce & Company was another name for J. A. Saxon Mercantile Co., and that credit was extended to such corporation, you will find for defendants Robinson and Hoskins." The Supreme Court said that this was a correct charge. Manifestly for the reason that a loan to a corporation imposed no individual liability upon the stockholders. The trial court also gave the following instructions: "If you believe from the evidence that prior to the execution of the note herein sued, the defendants Robinson, Hoskins, Saxon and Pierce agreed to cease doing business in the name of J. A. Saxon Mercantile Company and to do business in the name of Saxon, Pierce & Company for their mutual benefit, this in law would make them all partners whether they intended to

become partners or not, and if you so find, you will find for the plaintiff against the defendants Robinson and Hoskins, and in favor of the defendants Saxon and Pierce." The instruction to find for Saxon and Pierce was, of course, based upon the fact that they had been discharged in bankruptcy. The Supreme Court approved this charge, thus clearly holding that if the business was conducted in the name of Saxon, Pierce & Co., they became partners whether they intended that result or not, and Robinson and Hoskins would be liable as members of the partnership; but the court further said they doubted whether the instructions should have been given on account of the testimony which failed to show that Robinson and Hoskins were parties to the loan, and said: "If the stockholders of the corporation agreed to cease doing business as a corporation, and to carry it on as a partnership under the name of Saxon, Pierce & Co., all would be bound for the debt."

■ According to the testimony of Dickinson, a similar condition exists in the instant case. The old corporation had not been dissolved, but the three original stockholders were trying to wind it up and pay off its debts in order to avoid bankruptcy. They were keeping its business transactions and its bank account separate from the new company. The new company was being operated in a rather unusual manner, in that its funds were deposited to the individual account of Quick and its checks drawn in the name of Yellow House Mills were, it seems, paid out of that account. If Dickinson, Sr., had no knowledge of how the business was being conducted, he would have occupied the position of Robinson and Hoskins in the Robinson case; but he says he was the president of the old corporation and knew how the account of the Yellow House Mills was being handled. According to his testimony, the Yellow House Mills was, in law, a partnership and under the general rule that each partner is an agent of the firm, authorized to represent it in the business for which it was organized, judgment was properly rendered against Dickinson.

■ The appellee testified that he saw an advertisement in the Avalanche-Journal, as follows: "Wanted. Good Hygeria Bundles. Will Pay Top Prices. Yellow House Mills, owned and operated by Lubbock Grain & Coal Co., 'phone 194."

Appellants insist that because of the information received from this advertisement, he 'phoned and called upon Quick personally, and is estopped from asserting that he was led to believe that the Yellow House Mills was a different company or concern from the said Lubbock Grain & Coal Company. We confess our inability to see any element of estoppel in it. He said that he did not rely on the advertisement, but it led him to 'phone, and when he called he recognized the voice of Quick and questioned him as to who the Yellow House Mills were and that Quick told him to "come over," and he went and discussed the matter with him, learning that the Yellow House Mills was a different company. There is no merit in this contention.

While it is true that plaintiff, as one ground of his recovery, alleged that the defendants had changed the name of the Lubbock Grain & Coal Company without complying with the legal prerequisites in doing so and thereby became partners, proof of such allegation was not necessary to entitle him to recover, if, in fact, a new business concern was organized, even by stockholders in the original corporation. It appears from Quick's testimony that after the organization of the Yellow House Mills partnership, no business, so far as the record shows, was conducted by or in the name of the original corporation. He testified: "The purchase of this grain from the plaintiff in this case and the money for the sale of that and the operation of the purchase and sale of that grain was done under the division of the company as Yellow House Mills. The Yellow House Mills as such hired employees. Lubbock Grain & Coal Co. did not at that time, as such company, hire employees. There were no employees of the Lubbock Grain & Coal Co., as such at that time."

So far as the plaintiff's right to recover is concerned, it is immaterial whether the name of the original corporation was changed or whether, in fact, there ever existed any such corporation. At the time of the transaction which forms the basis of this suit, the old corporation had ceased to function but the stockholders had put in a feed mill and were doing business under another name, and plaintiff dealt only with the new company after having been informed by Quick that such a company existed.

We think a proper judgment has been entered against both defendants, and it is affirmed.